Submitted on record and briefs June 20, reversed December 13, 2006

In the Matter of Randy Allen,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

RANDY ALLEN,
*Appellant.*

0508-68657; A129859

149 P3d 289

Lance D. Perdue filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Seann C. Colgan, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman* and Ortega, Judges.

LANDAU, P. J.

---

\* Schuman, J., *vice* Ceniceros, S. J.

## LANDAU, P. J.

Appellant appeals an order of involuntary civil commitment, arguing that the record is insufficient to support a finding by clear and convincing evidence that he suffers from a mental disorder that renders him a danger to himself or others or unable to provide for his basic needs. ORS 426.005(1)(d)(A). On *de novo* review, *State v. Hitt*, 179 Or App 563, 565, 41 P3d 434 (2002), we reverse.

The evidence admitted into the record is limited. Appellant appeared for a civil commitment hearing. Two mental health examiners were present. The court admitted into evidence a "Notice of Treatment Prior to Hearing," which lists certain medications that had been administered to appellant in the week before the hearing. A report of precommitment investigation was *not* admitted into evidence, apparently because the precommitment investigator was not present. *See* ORS 426.095(4)(d)(C) ("Neither the investigation report nor any part thereof shall be introduced into evidence * * * unless the investigator is present during the proceeding to be cross-examined or unless the presence of the investigator is waived * * *.").

The hearing itself was brief. From the outset of the hearing, however, it became apparent that appellant's thought processes were significantly disorganized. The court, for example, attempted to communicate to appellant the nature of the hearing, with the following responses from appellant:

"THE COURT: [Appellant], I'm here today to try to determine whether or not you are suffering from an illness, that is to say, a mental disorder, as defined by our laws, and if you are, the real question for me is whether I should order that you go back to the hospital to let the doctors be the ones to decide on a proper discharge date for you. I take it you don't want to go back to the hospital today?

"[APPELLANT]: There isn't a hospital. There aren't any mental hospitals in Oregon. It's been on the news.

"THE COURT: Well, but haven't you been in the hospital for the last week?

"* * * * *

"[APPELLANT]: I went to Emanuel Hospital on another case, when I had my head bashed in and was murdered.

"THE COURT: And you were murdered?

"[APPELLANT]: Yeah, and with the last name of Ashbury after that.

"THE COURT: Well, you're very alive right now.

"[APPELLANT]: Yeah I'm very alive.

"THE COURT: Well, how could you get murdered and now be alive?

"[APPELLANT]: It was a childhood incident on something that happened, and was involved, and I'm in this building right now so you can ask some questions about it."

After the initial colloquy between the court and appellant, examiner Mohler interviewed appellant. In response to Mohler's questions, appellant denied that he suffered from a mental disorder. When Mohler suggested that he might be a danger to others, appellant responded, "I wouldn't say I'm danger to anything." Appellant also denied that he was a danger to himself, and, when Mohler asked him if he was able to provide for his own basic needs, appellant responded, "I can take care of my own needs." Mohler then asked appellant to describe why he had been taken into custody:

"MOHLER: Do you know why you were taken to the hospital?

"[APPELLANT]: If a person (indiscernible) man, that said he was murdered in May (indiscernible). He thought he was getting away with murder in May.

"MOHLER: Why did you push him?

"[APPELLANT]: Just pushed about that hard.

"MOHLER: But why?

"[APPELLANT]: Because he thought he was getting away with murdering me when I was sleeping.

"* * * * *

"MOHLER: And that was over at the Royal Palm, is that correct?

"[APPELLANT]: I guess if you want to call it that. It's off of Burnside of Flanders and things (inaudible).

"MOHLER: And you used to work there at the Royal Palm, is that right?

"[APPELLANT]: Not really. I was just there because I had no place to go.

"MOHLER: M-hm. Well, according to our report, that you've been banned from the Royal Palm; they don't want you there. * * * [T]hey say you were harassing people. Is that true?

"[APPELLANT]: I wasn't harassing anybody.

"MOHLER: Threatening people?

"[APPELLANT]: Didn't threaten anybody."

After Mohler finished interviewing appellant, the court asked the examiners for their opinions. Examiner Korsf expressed her opinion that appellant was "delusional" and "extremely dangerous to other people," explaining that "[h]e thinks people murdered him when he was young, and he thinks that it's okay to retaliate against people, physically." Examiner Mohler agreed, stating that appellant was "quite delusional, quite disorganized" and that, because of appellant's beliefs that others were trying to murder him, he was "definitely a danger to others, [and] a danger to himself."

At the end of the proceedings, the court concluded that appellant suffered from a mental disorder that made him a danger to himself, a danger to others, and unable to care for his own needs. The court also found that appellant was "unwilling, unable or unlikely to participate in treatment on a voluntary basis," and therefore ordered that he be committed to the Department of Human Services (DHS) for 180 days.

On appeal, appellant does not challenge the court's finding that he suffers from a mental disorder but argues that the trial court erred in ordering his commitment because the state failed to carry its burden of proof in establishing that he is a danger to himself or to others or that he is unable

to provide for his basic needs. According to appellant, although the record demonstrates that he suffers from significantly disorganized thinking, there is a complete absence of evidence that his condition renders him a danger—either to others or himself—or incapable of taking care of his own basic needs.

The state does not contest appellant's contention that the record is deficient as to the trial court's finding that he is a danger to himself and that he is unable to provide for his basic needs. The state argues, however, that the record is sufficient to support the court's finding that appellant is a danger to others. According to the state, the trial court's finding that appellant is a danger to others is supported by two pieces of evidence: (1) appellant's "admission that he pushed someone," apparently in response to his delusion that the person had tried to "murder" him while he was sleeping; and (2) the conclusions of the mental health examiners.

■■■ The state has the burden to prove by "clear and convincing evidence" that appellant was either a danger to himself or others or was unable to care for his basic needs. ORS 426.005(1)(d); ORS 426.130(1)(b). As we have frequently emphasized in commitment cases, the "clear and convincing" standard imposes on the state a heavy burden. *See State v. Hambleton*, 202 Or App 526, 533-34, 123 P3d 370 (2005) (explaining that the state's burden in civil commitment cases is "the product of a fundamental recognition of the priority of preserving personal liberties" (internal quotation marks omitted)). To warrant an individual's involuntary commitment, the state is required to produce evidence that is of "extraordinary persuasiveness" and which makes the fact in issue "highly probable." *Id.*

In light of the state's heavy burden, the evidentiary record in this case is unusually thin. The presentence investigation report was not admitted into evidence. No witnesses testified at the commitment hearing regarding appellant's psychiatric history or about the details of the incident that led to his hospitalization. Other than appellant and the two examiners, one of whom did not interview appellant, no one testified at the commitment hearing at all. The evidence to support appellant's commitment, therefore, is limited to

appellant's testimony, his demeanor at the commitment hearing, and the conclusions of the two examiners. We turn to whether that limited evidence nevertheless was sufficient to satisfy the state's burden.

■  If the state relies on a past violent act to establish that a person poses a danger to others, the state "must show that the act 'clearly forms the foundation for a prediction of future dangerousness.'" *State v. Lott*, 202 Or App 329, 335, 122 P3d 97 (2005), *rev den*, 340 Or 308 (2006) (quoting *State v. Lucas*, 31 Or App 947, 950, 571 P2d 1275 (1977)). In this case, the state did not do that. The state relies on what it characterizes as appellant's "admission" that, on a single occasion, he "pushed someone."

■  To begin with, it is not clear to us that, if there were such an admission, it would suffice. A single incident in which a person "pushed someone," without more, hardly establishes a foundation for a prediction of future dangerousness. Aside from that, on the record before us, the precise nature of the pushing incident itself is not entirely without doubt. To be sure, appellant did state that he pushed another person, although he appeared to contest that the push was very "hard." But the record contains no other corroborating evidence that appellant attacked someone or any details about the circumstances at the time the incident occurred.

■  As we noted, the record also includes the examiners' conclusions that appellant "definitely" poses a danger to others. In determining whether a person is a danger to others, a court may appropriately consider the testimony of mental health experts, in addition to evidence of the person's past acts and the person's demeanor at the commitment hearing. *Lott*, 202 Or App at 335. The bare conclusion of an examiner, however, is not adequate to support commitment; an examiner's conclusion must be supported by facts. *State v. Whitman*, 132 Or App 596, 599, 889 P2d 372 (1995). In this case, the examiners' conclusions that appellant is a danger to others are unconfirmed by any other evidence in the record. Those bare conclusions do not constitute clear and convincing evidence.

As we have noted, the trial court based its decision on a determination that appellant, in addition to being a danger to others, is a danger to himself and cannot provide for his own basic needs. The state does not argue that the court's determinations are supported by evidence in the record, although it does not concede the matter either.

We conclude that, for reasons similar to those already set out above, the state fell short of meeting its burden with respect to whether appellant poses a danger to himself. To establish that appellant is dangerous to himself, the state must show that appellant's mental disorder has resulted in harm to himself " 'or created situations likely to result in harm.' " *State v. Judd*, 206 Or App 146, 152, 135 P3d 397 (2006) (quoting *State v. Sea*, 137 Or App 333, 338, 904 P2d 182 (1995)). This court has frequently noted that a speculative threat, alone, is not sufficient. *See, e.g., State v. Stanley*, 117 Or App 327, 330, 843 P2d 1018 (1992) ("Apprehensions and speculations alone are not enough to find a person in need of treatment."); *State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) (same). Nor is exhibiting delusional or bizarre behavior necessarily sufficient to warrant commitment. *State v. Powell*, 178 Or App 89, 95, 35 P3d 1084 (2001).

The only evidence in the record in this case that directly relates to whether appellant's mental disorder has resulted in harm in the past or created specific situations "likely to result in harm" is appellant's testimony regarding the incident in which he pushed someone. For the reasons we have already described, however, that testimony falls short of the clear and convincing evidence required. Appellant's delusional behavior at the hearing, and the examiners' conclusions that he is likely to come into harm's way, are also certainly probative of whether appellant poses a "danger to self." Even considering that evidence, however, the record still lacks the kind of clear and convincing evidence of a particularized threat that is required for involuntary commitment on this ground. *State v. Olsen*, 208 Or App 686, 145 P3d 350 (2006).

Nor does the record contain clear and convincing evidence that appellant is unable to provide for his basic needs. To justify commitment on that basis, the state is required to

show that appellant "probably would not survive in the near future because he is unable to provide for basic personal needs and is not receiving care necessary for health or safety." *State v. Hayes*, 202 Or App 63, 67, 121 P3d 17 (2005). The state did not do that in this case. The only testimony that relates directly to that question is appellant's own assertion that he was able to take care of himself. There is simply no evidence in the record that appellant's near-term survival was jeopardized by his mental disorder. In sum, there is insufficient evidence in the record to establish that appellant posed a danger to others, a danger to himself, or was unable to provide for his basic needs. It follows that the trial court erred in ordering his involuntary commitment.

Reversed.