Submitted August 31, reversed October 27, 2021

In the Matter of M. L.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

M. L.,
*Appellant.*

Marion County Circuit Court
20CC04744; A174535

501 P3d 85

Appellant seeks reversal of a judgment involuntarily committing him to the Oregon Health Authority for up to 180 days and an order prohibiting him from purchasing or possessing firearms. On appeal, he argues that the evidence was legally insufficient to prove that he suffered from a mental disorder that makes him a "danger to self." ORS 426.005(1)(f)(A). *Held*: The Court of Appeals concluded that the evidence in this case does not reflect the kind of particularized, near-term threat that is required to justify appellant's involuntary commitment on the ground that he is a danger to himself. Thus, the evidence was legally insufficient to support the trial court's determination that appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A).

Reversed.

Jennifer K. Gardiner, Judge pro tempore.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Daniel Norris, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Reversed.

**TOOKEY, J.**

Appellant seeks reversal of a judgment involuntarily committing him to the Oregon Health Authority for up to 180 days. He argues that the evidence was legally insufficient to prove that he suffered from a mental disorder that makes him a "danger to self." ORS 426.005(1)(f)(A); ORS 426.130(1)(a)(C), (1)(a)(D), (2). For the reasons that follow, we agree with appellant and, accordingly, reverse.[1]

Neither party has requested that we review this matter *de novo*, and we conclude that this is not an "exceptional" case that warrants *de novo* review. *See* ORAP 5.40 (8)(C) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. L. D.*, 310 Or App 347, 348, 484 P3d 1100 (2021) (internal quotation marks omitted). "Whether the evidence is sufficient to support a determination that appellant is a danger to self is a question we review as a matter of law." *Id.* (internal quotation marks and brackets omitted).

The relevant facts are undisputed. Appellant has been diagnosed with bipolar disorder. The commitment hearing in this case took place in August 2020, when appellant was in the midst of a "manic episode." During such episodes, appellant is erratic and delusional, can be guarded and paranoid, does not sleep much, and believes "very wild ideas."

During the commitment hearing, the state presented evidence regarding two incidents upon which the trial court ultimately based its ruling that appellant was a danger to himself within the meaning of ORS 426.005 (1)(f)(A). Appellant's brother witnessed both incidents, and at the commitment hearing, he testified as to both.

---

[1] Appellant also appeals an order prohibiting him from purchasing or possessing a firearm. Because that order is dependent upon the court's determination that appellant is a danger to himself, and because we reverse that determination, we also reverse—without further discussion—the order prohibiting appellant from purchasing or possessing a firearm.

First, prior to the commitment hearing in this case, appellant had "covered himself" with "household chemicals," including splashing or "dousing" himself with bleach, because appellant believed that "the government is out to get him and that they're exposing him to radiation." Appellant's brother testified that that incident made him concerned for appellant's safety because "you don't know what kind of allergic reaction you can have on the skin" from bleach, and he did not know if appellant was going to "decide[] to ingest" the bleach or other chemicals. Nevertheless, appellant's brother testified that he did not see appellant "drink or imbibe" any of the household chemicals.

Second, prior to the commitment hearing in this case, appellant decided to walk from his house in Saint Paul, Oregon, to Portland, Oregon. During his testimony, appellant's brother explained:

"[W]e live out in the country in Saint Paul and [appellant] decides to leave in the middle of the night just walking down the road because he believes he has some special things that he needs to do in Portland with all these protests that he's involved, he believes he's involved in them. Or he, he believes he can resolve them, the problem, all the problems that are going on with the protests."

Appellant's brother further testified, regarding appellant's decision to walk to Portland, that appellant told him:

"[T]here's a mission that needs to be executed and that [appellant] just needs to get to his destination to save people, to help people, to carry out a master plan."

Appellant's brother also testified that appellant has never harmed himself or threatened to harm himself, and that appellant does not acknowledge that he has a mental disorder.

A psychiatrist who had treated appellant at the hospital in Salem, Oregon, for the four days prior to the commitment hearing testified that there was no record of appellant engaging in suicidal behaviors or self-harm and that, during appellant's admission at the hospital in Salem, appellant had refused medication on eight of the 10 occasions

he had been scheduled to take it. Additionally, evidence was presented that appellant was hospitalized for psychiatric issues in 2017, and that, prior to that hospitalization, appellant was "picked up in somewhere in Beaverton[, Oregon,] walking around the streets shoeless, blisters all over his feet."

At the end of the commitment hearing, the trial court determined that the state had met its burden of demonstrating that appellant was "dangerous to self" within the meaning of ORS 426.005(1)(f)(A). The trial court explained that appellant "is actively manic," and that, when appellant is manic, "he's erratic, he makes poor decisions, he doesn't sleep, he rambles on regarding conspiracy theories, believes in crazy things, [and] is delusional." The trial court further explained that appellant's mania "leads him to make poor decisions that put himself in danger," and "specifically the danger he puts himself in is splashing, dousing himself with bleach." The trial court noted that appellant's brother "specifically remembered the bleach because it was concerning enough to him in the way that [appellant] was pouring it on his body that it could cause harm or damage to him," and that appellant's brother "also described how [appellant] left the home in the middle of the night to walk to Portland, [which] put [appellant] in a position of harm as well." As a result, the trial court determined that "the current indicators and symptoms of [appellant's] mental illness and behaviors that he manifests during his mental illness *** do show that threatened harm to himself is likely to occur."

The trial court then issued a judgment committing appellant to the Oregon Health Authority for a period not to exceed 180 days, which appellant appeals.[2]

Under Oregon law, a person may be involuntarily committed if the person is determined to be a "person with mental illness." ORS 426.130(1)(a)(C). As pertinent to this appeal, a "person with mental illness" includes someone

_____

[2] The trial court also determined that the state had not met its burden to demonstrate that appellant was "dangerous to *** others" within the meaning of ORS 426.005(1)(f)(A) and that the state had not met its burden to demonstrate that appellant was unable "to provide for basic personal needs that are necessary to avoid serious physical harm" within the meaning of ORS 426.005(1)(f)(B). Those two determinations are not at issue on appeal.

who suffers from a "mental disorder" and, as a result of that disorder, is "[d]angerous to self." ORS 426.005(1)(f)(A). The state bears the burden of proving the statutory requirement of "dangerous to self" by "clear and convincing evidence." ORS 426.130(1)(a).

Our cases "have uniformly imposed a rigorous threshold with respect to what the state is required to show to establish that an individual is dangerous to self *** as a matter of law." *State v. S. R. J.*, 281 Or App 741, 749, 386 P3d 99 (2016) (internal quotation marks omitted). "Although 'dangerous' is a common term that, in ordinary usage, may refer to a broad range of threats, the type of 'danger' necessary to justify an involuntary civil commitment is a narrow range of serious and highly probable threats of harm." *Id.* To permit "commitment on the basis that a person is dangerous to self, the clear and convincing evidence must partake of a particularized, and highly probable, threat to the appellant's safe survival, including a risk of substantial harm, in the near future." *Id.* (internal quotation marks and brackets omitted). That is, the threatened harm to self "must involve 'serious' and 'actual' physical harm in the 'near term.'" *Id.* (quoting *State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010)). "[T]he prospect of serious physical harm must be based on more than apprehensions, speculations, and conjecture." *Id.* at 750 (internal quotation marks omitted). "Delusional or eccentric behavior—even behavior that may be inherently risky—is not necessarily sufficient to warrant commitment." *Id.* (internal quotation marks omitted). "We impose those rigorous standards because of the serious deprivation of liberty and social stigma that are attendant to a civil commitment, and the fact that such a preventive confinement is predicated on a prediction of future behavior." *Id.* at 749 (internal quotation marks omitted).

On appeal, appellant contends that "the record in this case lacks clear and convincing evidence that due to a mental disorder appellant presented a particularized and highly probable threat of serious physical injury to himself in the near term." More specifically, appellant contends that the "evidence presented at the appellant's hearing was insufficient to prove that he was in danger of causing himself substantial harm by pouring bleach on his skin." Appellant

also contends that there "was no evidence in the record that the appellant had ever been injured while leaving the house in the middle of the night or by walking down the road."

The state, for its part, contends that "clear and convincing evidence supported the trial court's conclusion that appellant was a person with a mental disorder who, because of that mental disorder, was a danger to himself." In the state's view, appellant "endangered his safety by pouring bleach directly on his skin to clean off what he believed to be radiation that the government placed on him" and that he "endangered his safety when, in a manic state, he attempted to walk at night approximately 30 miles to Portland believing that he could stop last summer's civil unrest if he could be physically present."[3]

Although "fact matching in these kinds of cases is often of little utility because every involuntary mental commitment case must be decided on its individual facts under the applicable standards," *State v. S. E.*, 313 Or App 678, 684, 496 P3d 1140 (2021) (internal quotation marks and brackets omitted), "our decisions addressing putative 'danger to self' commitments based on 'harm's way' concerns highlight the proper application of the [applicable] legal principles," *State v. T. Y.*, 285 Or App 21, 25, 396 P3d 986 (2017) (some internal quotation marks omitted). In prior cases we have concluded, for example, that "evidence that the appellant, who suffered from delusions, had 'poor judgment,' and had a tendency to 'travel aimlessly' and to 'walk into people's homes' was insufficient to establish the requisite danger to self," *B. B.*, 240 Or App at 83 (quoting *State v. Olsen*, 208 Or App 686, 689-90, 145 P3d 350 (2006)); that "the facts that appellant lacked self-control, had lost a significant amount of weight,

---

[3] On appeal, in arguing that the trial court did not err in determining that appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A), the state also points out that a "grand jury indicted appellant for unlawful use of a weapon and resisting arrest" and that the trial court took judicial notice of that indictment. It is true that appellant was so indicted and that the trial court took judicial notice of that indictment. But the trial court did not rely on the allegations in the indictment in determining that appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A). Further, "an indictment is not evidence of guilt." *State v. Miller*, 54 Or App 323, 330, 634 P2d 1361 (1981), *rev den*, 292 Or 450 (1982). Consequently, the fact of appellant's grand jury indictment is not material to our analysis.

and had repeatedly hit her head against a Plexiglass divider separating the front and back seats in a police car, was insufficient to sustain a commitment based on danger to self," *B. B.*, 240 Or App at 84 (citing *State v. Powell*, 178 Or App 89, 35 P3d 1084 (2001)); and that "evidence was insufficient to support a commitment based on danger to self where the appellant was confused and disorganized, 'had a pattern of unpredictably and impulsively running away when the voices she hears tell her that she or her child is in some kind of danger,' had, on at least three occasions, run away 'apparently guided by her command hallucinations,' and suffered cuts, abrasions, and swelling to her face," *T. Y.*, 285 Or App at 25-26 (quoting *B. B.*, 240 Or App at 84).

    In light of those legal principles, in this case, viewed in the light most favorable to the trial court's ruling, we conclude that the evidence was legally insufficient to support involuntary commitment on the basis that appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A). The evidence in this case clearly establishes that appellant suffers from bipolar disorder; that he refuses medication for his condition; that, on one occasion, he put bleach and other household chemicals on his body due to a concern about the government exposing him to radiation; and that he left his home in Saint Paul one night to attempt to walk to Portland. It also establishes that—years prior—appellant was discovered in Beaverton walking around, shoeless, with blisters on his feet.

    But, on this record, we cannot say that appellant's conduct establishes a "'highly probable,' threat to appellant's safe survival, including a risk of substantial harm, in the near future.'" *B. B.*, 240 Or App at 84 (internal citation omitted). The record does not reflect that harm occurred to appellant as a result of his conduct with regard to the bleach and other household chemicals. The record is also devoid of evidence regarding where on his body appellant put the bleach and other household chemicals (other than that he did not drink or imbibe such chemicals), and devoid of evidence regarding how long he was exposed to such chemicals. And, importantly, there is an absence of evidence from which the trial court could infer that appellant was likely to repeat

his conduct with regard to the bleach and other household chemicals, and that if he did repeat that conduct, it would or could result in "serious and actual physical harm." *S. R. J.*, 281 Or App at 749 (internal quotation marks omitted).

Further, appellant's conduct of deciding to walk to Portland on a "mission" to "carry out" a "master plan" is, understandably, a cause for concern for appellant's family— particularly in light of the prior incident when appellant was "picked up" in Beaverton with blisters on his feet. But as noted above, delusional behavior, even behavior that may be inherently risky, is not necessarily sufficient to warrant involuntary commitment. On this record, the risk of harm to appellant from attempting to walk to Portland—even assuming such conduct were to occur again—is not the sort of "particularized" and "highly probable" threat sufficient to establish that appellant was a danger to self within the meaning of ORS 426.005(1)(f)(A). *S. R. J.*, 281 Or App at 749 (internal quotation marks omitted).

In sum, the evidence in this case does not reflect the kind of "particularized, near-term threat that is required to justify appellant's involuntary commitment on the ground that he is a danger to himself." *Olsen*, 208 Or App at 693. Accordingly, we reverse.

Reversed.